

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00197-CR

_____

TAREQ ALKAYYALI, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1598293D

---

Before Kerr, Birdwell, and Walker, JJ.
Opinion by Justice Walker

## OPINION

After a jury trial, Appellant Tareq Alkayyali was convicted of murdering his wife and sentenced to 23 years' confinement. Alkayyali raises ten points of error related to the jury charge, the effectiveness of his trial counsel, the sufficiency of the evidence, and various evidentiary rulings made by the trial court. Because Alkayyali was egregiously harmed by the undisputed jury-charge error in this case, we will reverse and remand to the trial court for further proceedings.

## I. BACKGROUND

### A. FACTUAL BACKGROUND

Alkayyali grew up in Jordan but moved to Texas in 2009. In November 2017, Alkayyali and Wasam Moussa were engaged in Jordan and celebrated their wedding there in August 2018. Throughout the engagement and after the wedding, Moussa frequently indicated that she did not want to be married to Alkayyali and began requesting a divorce as soon as the day after the wedding.

On the night of the wedding, Moussa fainted but quickly regained consciousness. Alkayyali testified that Moussa had "been having the fainting most of the time" and that he "used to hear that whenever she go to work or she go to school, she would faint from, like, no reason."[1] A few days after the wedding while the couple was still in Jordan, Moussa started shaking and complaining of breathing

---

[1]English was not Alkayyali's first language and he testified that he struggles to explain himself in English and that "[a] lot of people they correct whatever I say."

troubles and chest pains, so Alkayyali took her to the emergency room. According to Alkayyali, her heart rate "wasn't stable" but she refused treatment and left the emergency room against a doctor's recommendation. Alkayyali also testified that Moussa fainted again at work later that month.[2]

Alkayyali returned to Texas alone about a month after the wedding, where he continued working as a manager at a local restaurant. Moussa continued to ask for a divorce and Alkayyali continued to decline, expressing frustration to Moussa's family that she would not give a reason for wanting a divorce. In spite of this, Moussa came to live with Alkayyali in Texas on May 25, 2019.

On the day of Moussa's arrival, Alkayyali had text conversations with Vernie "Alicia" Smith, a friend and manager at the restaurant. In these messages, Alkayyali expressed frustrations about his relationship with Moussa saying that she did not respect him, treated him like "shit," and that he was unable to joke with or touch her. He said that his "situation [was] bad" and that he was sure that Moussa had "a black soul." Later that day, Alkayyali texted Smith that he did not "feel good" and that he hated his life. He continued that he loved Moussa but that he wanted his "old wife" as he used to know her.

---

[2]Evidence also established that Moussa had previously suffered from a ventricular septal defect (VSD)—a hole in her heart—that was surgically repaired in 2013.

Alkayyali testified that the relationship continued to be strained after Moussa arrived in Texas such that Moussa slept in the bedroom and he slept on the couch. On May 27, Moussa sent Facebook messages to her brother saying that she and Alkayyali had argued loudly and that he moved toward her to put his hands over her mouth. But he stopped when she screamed "don't touch me." That night, Alkayyali and Moussa agreed to divorce.

Alkayyali testified that, on the morning of May 28, he and Moussa argued as he prepared to go to work. He said that he pushed Moussa, that she started yelling, and that he put his hand over her mouth to stop her from yelling. They then fell to the floor, she bit him, and he released his hand; he put his hand over her mouth again to stop her from yelling, and then she fainted. He testified that he thought she merely fainted as in previous instances. He then carried her and set her unconscious on the bed. Around 6:00 a.m., Alkayyali called a manager at the restaurant—Lauren Hastings—to say he would be late for work and left the apartment.

While driving, Alkayyali called Smith at 6:29 am. He told Smith that he had hit his wife and covered her mouth, that she was not breathing,[3] and that he was going to jail for the rest of his life. Smith told him to get help and to call 9-1-1. Alkayyali returned to the apartment and called 9-1-1. Police arrived and began CPR on Moussa and then a paramedic continued the CPR and intubated her, but they were unable to

---

[3]Alkayyali testified that the English word "fainting" is translated literally into Arabic as "not breathing."

4

revive her. The paramedic testified that he noticed bloody sputum in Moussa's throat and "ligature lines" on her neck that, to him, indicated that she had been strangled with an object such as rope or a belt.

Medical examiner Marc Krouse performed Moussa's autopsy and concluded that the cause of her death was "homicide or death at the hands of another and asphyxia." However, Krouse did not testify at trial because he had since been terminated from his position at the medical examiner's office for "lack of due diligence" displayed in many of his autopsy reports. A peer review of forty-one of Krouse's autopsies revealed that he had made errors—at least one serious enough to change the cause of death from homicide to undetermined—in about twenty-five of those cases.[4]

Testifying from Krouse's autopsy report and pictures, medical examiner Richard Fries observed that Moussa had various lacerations and bruises on her lip and also "indistinct" bruising on her neck and chest. When asked about the bloody sputum observed by the paramedic, Fries explained that such a substance can appear when a person is suffocated or strangled manually. Further, the autopsy revealed petechiae[5] under Moussa's scalp. She did not, however, have any bruising under the

_____

[4]Moussa's autopsy was not one of the forty-one included in this investigation. Richard Fries testified, however, that Krouse's autopsy of Moussa had been peer-reviewed by at least five additional medical examiners.

[5]Fries explained that petechiae sometime appear in the scalp and other places on the body when a person's jugular vein is obstructed—for instance if they are being

skin in her neck or any broken bones in her neck. Nor did the autopsy show any ligature marks to suggest that Moussa had been strangled using an object. Based on the evidence, Fries agreed that Moussa's death was properly classified as a homicide by asphyxia. He said that to manually strangle or smother someone to death would take "minutes."

Fries also discussed Moussa's VSD repair, stating that it was intact at the time of her autopsy and that it was his opinion that it did not contribute to her death. According to Fries, even had the VSD not been repaired, he would not expect it to have caused immediate death but rather to have led to progressive and protracted heart failure.

On the autopsy report, Krouse noted that Moussa's VSD was "abutting the conduction system." When asked about this notation on cross-examination, Fries explained that the heart's conduction system regulates a person's heart rate. He testified that the conduction system can be implicated when a person experiences an irregular heartbeat and fainting episodes, which can lead to death. And it is not uncommon when performing an autopsy on a person who has died from an irregular heartbeat for there to be "no documentable anatomic findings," which might lead the medical examiner to arrive at an undetermined cause of death. He surmised, however, that Krouse included the conduction-system notation to simply describe the location

strangled—and blood cannot escape the brain, causing capillaries to burst and hemorrhage.

6

of Moussa's VSD. He also pointed out that in 2018 Moussa had a "normal echocardiogram" that had not raised any concerning issues with her heart.

## B. INDICTMENT AND JURY CHARGE

Alkayyali was charged with Moussa's murder. The indictment against him contained two paragraphs alleging alternate theories of the murder:

> That Tareq Alkayyali . . . did then and there intentionally or knowingly cause the death of an individual, Wasam Moussa, by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm, or by blocking her nose or mouth with his hand or hands.

> That [Alkayyali] did then and there intentionally, with the intent to cause serious bodily injury to Wasam Moussa, commit an act clearly dangerous to human life, namely by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose or mouth with his hand or hands.

Though the second paragraph omitted an element of the offense—that the act "causes the death of an individual"—Alkayyali did not object to the indictment. *See* Tex. Penal Code Ann. § 19.02(b) (providing the elements for the offense of murder).

The jury charge instructed the jury members that they had "no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule [the trial court] may state" and that it was their "duty to apply the law as [the trial court] explain[ed] it to [them], regardless of the consequences." The abstract paragraph of the charge correctly included the "causes the death of an individual" element in the second theory. However, the application

7

paragraph omitted that element and instructed the jury that it must find Alkayyali

guilty of murder if it found beyond a reasonable doubt that he

> intentionally or knowingly cause[d] the death of an individual, Wasam
> Moussa, by impeding the normal breathing or circulation of the blood of
> Wasam Moussa by applying pressure to her throat or neck with his hand
> or arm or by blocking her nose or mouth with his hand or hands; *or* [if it
> found that he] intentionally, with the intent to cause serious bodily injury
> to Wasam Moussa, commit[ted] an act clearly dangerous to human life,
> namely, by impeding the normal breathing or circulation of the blood of
> Wasam Moussa by applying pressure to her throat or neck with his hand
> or arm or by blocking her nose or mouth with his hand or hands . . . .[6]
> [emphasis added]

Alkayyali did not object to the jury charge at trial.

### C. OTHER RELEVANT RECORD INFORMATION

At voir dire and in closing arguments, both the State and Alkayyali's attorney

discussed generally the elements of murder, including that a person's guilt arises only

if his actions "cause the death" of the victim. However, before the evidence opened,

the State read verbatim the indictment in the presence of the jury, which omitted the

"causes the death of" language from the second theory. And contested issues about

Moussa's fainting, heart issues, and ultimate cause of death featured prominently in

the opening and closing arguments of both the State and defense. Finally, at the

punishment phase of trial, the jury was asked to determine the special issue of

---

[6]The application paragraph also contained instructions for the lesser-included
offenses of manslaughter and criminally negligent homicide; both of these instructions
included the "causes the death of an individual" element. *See* Tex. Penal Code
Ann. §§ 19.04, 19.05 (providing the elements for the offenses of manslaughter and
criminally negligent homicide).

8

whether Alkayyali murdered Moussa "under the immediate influence of sudden passion arising from an adequate cause." During their deliberations, the jury sent a note to the trial court that asked how they should proceed if they did "not all agree it was sudden passion[?]"[7]

In the end, the jury found Alkayyali guilty of murder and sentenced him to twenty-three years' confinement.

## II. STANDARD OF REVIEW AND RELEVANT LAW

When, as here, the defendant does not object to jury-charge error[8] at trial and raises the issue for the first time on appeal, reversal is warranted only if the error resulted in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Egregious harm is a difficult standard to meet and should be determined on a case-by-case basis. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016); *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). "[C]ourts are required to examine the relevant portions of the *entire* record to determine whether [the defendant] suffered actual harm, as opposed to theoretical harm, as a result of the error." *Marshall*,

---

[7]The trial court responded: "[i]n response to your note, please continue to deliberate," and the jury ultimately found that sudden passion did not exist.

[8]The State concedes, and we agree, that charge error occurred here because the application paragraph omitted an essential element of the offense of murder under Section 19.02(b)(2) of the Texas Penal Code. *See Mendez v. State*, 545 S.W.3d 548, 553 (Tex. Crim. App. 2018); *Flores v. State*, 48 S.W.3d 397, 402 (Tex. App.—Waco 2001, pet. ref'd).

479 S.W.3d at 843 (emphasis in original); *Almanza*, 686 S.W.2d at 174. "Charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Villareal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 172. In examining the record to determine whether charge error has resulted in egregious harm, we consider (1) the entirety of the charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the trial record as a whole. *Villareal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171.

In Texas, a person commits the offense of murder if he "(1) intentionally or knowingly causes the death of an individual" or "(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code Ann. § 19.02(b)(1)–(2). When more than one possible theory of a single criminal offense is alleged, the jury need not be unanimous as to which theory it relied upon in reaching its verdict. *Young v. State*, 341 S.W.3d 417, 422 (Tex. Crim. App. 2011).

## III. DISCUSSION

In his second point of error,[9] Alkayyali argues that he was egregiously harmed by the omission of the "causes the death of" element from the second theory alleged in the jury charge's application paragraph. According to Alkayyali, the charge

[9]We address Alkayyali's second point of error first because its resolution will prove dispositive of the case. *See* Tex. R. App. P. 47.1.

10

impermissibly allowed the jury to convict him for murder without requiring it to find that he caused Moussa's death. While the State agrees that there was charge error, it contends that the record taken as a whole does not show egregious harm.

In support of his argument, Alkayyali relies heavily on *Flores v. State*, a case with remarkably similar charge-error facts. *See* 48 S.W.3d 397, 401–03 (Tex. App.—Waco 2001, pet. ref'd). Flores was tried for murder but the jury convicted him on the lesser-included offense of criminally negligent homicide. *Id.* at 403. The application paragraph of the jury charge authorized the jury to convict Flores on this charge in the disjunctive, if he either "with criminal negligence . . . cause[d] the death of [the victim] by striking [the victim]; or . . . with criminal negligence cause[d] blunt force injuries to [the victim] in a manner and means to the grand jury unknown." *Id.* at 401–02. Thus, like in our case, the "causes the death of" element was omitted from the second alleged theory in the application paragraph. *Id.*

The Waco court held that Flores was egregiously harmed by this error because it deprived him of his rights to due process and trial by jury, which rights entitle criminal defendants to have a jury determine guilt as to every element of the charged crime beyond a reasonable doubt. *Id.* at 403. While we find *Flores* persuasive here, we cannot rely solely on its reasoning because it did not perform a full analysis of the *Almanza* factors in relation to the record. *See Vasquez v. State*, 389 S.W.3d 361, 370 (Tex. Crim. App. 2012) (explaining that courts must undertake a "full *Almanza* analysis" in determining egregious harm).

11

## A. *ALMANZA* FACTORS WEIGH IN FAVOR OF EGREGIOUS HARM

As discussed above, an appeals court determines egregious harm stemming from jury-charge error chiefly by considering the factors outlined in *Almanza.* 686 S.W.2d at 171. This task, however, has been no easy feat for Texas courts, including the Court of Criminal Appeals. *Compare id.*, *with Hutch v. State*, 922 S.W.2d 166, 172–75 (Tex. Crim. App. 1996), *and Gelinas v. State*, 398 S.W.3d 703, 706–23 (Tex. Crim. App. 2013). One dissenting opinion from that court went so far as to characterize *Almanza* as a "tragedy" and "conundrum" that has created conflicting and uneven decisions "because the factors used to distinguish between harm and egregious harm are difficult to decipher." *Gelinas*, 398 S.W.3d 703, 713 (Meyers, J., dissenting). We can attest to this difficulty, particularly given the weighty and tragic circumstances raised by the facts of this case. But, in the end, our task is clear: we must determine from the entire record—in light of the *Almanza* factors—whether the jury-charge error here affected the very basis of the case, deprived Alkayyali of a valuable right, or vitally affected one of his defensive theories. *See Villareal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 172; *see also Vasquez*, 389 S.W.3d at 370.

Guided by constitutional principles and considering the record before us, we hold that Alkayyali was egregiously harmed.

### 1. Entirety of the Charge

The jury charge contained the following relevant information:

- It instructed the jury that it had "no right to disregard or give special attention to any one instruction" and that its duty was to "apply the law as" the trial court explained it;

- The abstract paragraph correctly included the "causes the death of" element for both theories of murder under Section 19.02(b)(1) and (2);

- The application paragraph omitted the "causes the death of" element for the second theory and instructed the jury that it must find Alkayyali guilty of murder if he intentionally, with intent to cause serious bodily injury, impeded her breathing or blood circulation;

- The application paragraph also included the elements for the offenses of manslaughter and criminally negligent homicide, both of which correctly included the "causes the death of" element.

Through the jury charge, the trial court must instruct the jury "under what circumstances they should convict, or under what circumstances they should acquit." *Gray v. State*, 152 S.W.3d 125, 128–29 (Tex. Crim. App. 2004) (internal quotations omitted). "The application paragraph is that portion of the jury charge that applies the pertinent law, abstract definitions, and general legal principles to the particular facts and the indictment allegations." *Vasquez*, 389 S.W.3d at 366. Accordingly, the application paragraph has been described as the "heart and soul" of the jury charge because it is the portion of the charge that authorizes the jury to act. *Id.* at 367; *Hutch*, 922 S.W.2d at 172 (holding that "[i]t is not sufficient for the jury to receive an abstract instruction of the law" and holding in favor of egregious harm when the application paragraph incorrectly stated the law); *see Gelinas*, 398 S.W.3d at 707 (declining to follow *Hutch* in placing "great weight" on charge error simply because it was located

13

in application paragraph but ultimately holding that such error did weigh in favor of egregious harm).

Though the abstract paragraph correctly informed the jury of every element of murder, the application paragraph authorized them to convict Alkayyali of murder without having to find beyond a reasonable doubt that he caused Moussa's death. In fact, taken as a whole, the charge instructed the jury members that it was their *duty* to do so. We are not persuaded that the inclusion of the "causes the death of" language in the abstract paragraph and the instructions for manslaughter and criminally negligent homicide sufficiently negated this harm. Rather, these aspects of the charge further highlight the confusion created on the face of the charge about what elements must be met for a person to be convicted of murder under Section 19.02(b)(2).

We hold that this factor weighs in favor of egregious harm.

### 2. State of the Evidence, Including Contested Issues and Weight of Probative Evidence

We concede that the State presented ample probative evidence to support Alkayyali's conviction and discuss this more fully in our evidentiary-sufficiency analysis below. However, the issue of Moussa's cause of death—and, relatedly, Dr. Krouse's history of faulty autopsies—was hotly contested and constituted Alkayyali's chief defense. If even a single juror was persuaded that Moussa's health issues created enough reasonable doubt as to the cause of her death, then Alkayyali could not have been convicted of murder.

14

Significantly, the charge error here related directly to this contested issue. By omitting the causation element from the second theory, the charge effectively erased Alkayyali's main defense from the jury's consideration. On this record and following this charge, a juror could have believed that Alkayyali assaulted Moussa but, due to her health issues, not been convinced beyond a reasonable doubt that the assault caused her death—and that juror could still have convicted him of murder. In other words, this charge functionally relieved the State of its burden to prove beyond a reasonable doubt that Alkayyali caused Moussa's death under the second theory. For these reasons, we hold that this factor weighs in favor of egregious harm.

### 3. Arguments of Counsel

Both the State and Alkayyali discussed the elements of murder at voir dire and in closing arguments, to include numerous mentions of the "causes the death of" element. We hold that this factor does not weigh in favor of egregious harm.

### 4. Other Relevant Record Information

Before the State's case-in-chief and in the presence of the jury, the indictment against Alkayyali was read verbatim, and that indictment omitted the "causes the death of" element from the second alleged theory. Additionally, during punishment deliberations, the jury sent a note to the trial court asking how to proceed if they were not unanimous as to the sudden-passion special issue. The State argues that this weighs against egregious harm because it shows that "the jury had agreed that Alkayyali caused Moussa's death, but did not agree about whether he did so under

15

sudden passion for the purposes of assessing punishment." Alkayyali, on the other hand, argues that the note weighs in favor of egregious harm because it shows that "at least some jurors did not believe this was an intentional or knowing murder, but voted to convict" on the second theory.

We do not believe the jury note preponderates either for or against egregious harm in any significant way. Sudden passion does not relate directly to the particular cause of death, but rather it relates to premeditation and whether the anger or fear experienced by the defendant rendered him incapable of cool reflection. *See Gonzales v. State*, 717 S.W.2d 355, 357–58 (Tex. Crim. App. 1986). Indeed, the jury could have found sudden passion under either theory alleged here. Thus, any inferences drawn from a punishment-phase jury note regarding the specific theory utilized by individual jurors at the guilt/innocent phase would be so tenuous as to render them almost meaningless.

However, because the jury was presented with the erroneous language from the indictment that omitted the "causes the death of" element from the second theory, we hold that this factor weighs slightly in favor of egregious harm.

## B. THE CHARGE ERROR DEPRIVED ALKAYYALI OF VALUABLE RIGHTS AND VITALLY EFFECTED HIS MAIN DEFENSIVE THEORY

Constitutional due process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Francis v. Franklin*, 471 U.S. 307, 313, 105 S. Ct. 1965, 1970

16

(1985) (internal quotations omitted). Constitutional due process also "guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 2146 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532 (1984)). These are "bedrock, axiomatic[,] and elementary" constitutional principles that protect a defendant from—among other things—jury charge issues that would effectively relieve the State of meeting its burden on every element of the charged offense. *Francis*, 471 U.S. at 313, 105 S. Ct. at 1970 (internal quotations omitted); *see Flores*, 48 S.W.3d at 403. We hold the State to such a high burden in criminal prosecutions because the stakes—one's life and liberty—are so great and because we as a society have made a "fundamental value determination" that it is "far worse to convict an innocent man than to let a guilty man go free." *Francis*, 471 U.S. at 313, 105 S. Ct. at 1970 (quoting *In re Winship*, 397 U.S. 358, 372, 90 S. Ct. 1068, 1077 (1970) (Harlan, J., concurring)).

Under the facts of this case, the omission of the "causes the death of" element from the application paragraph of the jury charge deprived Alkayyali of his right to due process and affected his main defensive theory by (1) relieving the State of its high burden of proving that he caused Moussa's death beyond a reasonable doubt and (2) undermining his right to present a complete defense that sought to question that causation. Thus, we hold that this error egregiously harmed Alkayyali and sustain his second point of error.

17

## C. THE EVIDENCE WAS LEGALLY SUFFICIENT

In his fourth and fifth points of error, Alkayyali contends that the evidence was legally insufficient on the element of intent: whether the State proved beyond a reasonable doubt that he either intended to kill Moussa or that he intended to cause her serious bodily harm. Though we have sustained Alkayyali's charge-error point, we must still consider his sufficiency point. *See Moff v. State*, 131 S.W.3d 485, 489–92 (Tex. Crim. App. 2004) (explaining that appellate courts must consider sufficiency challenges even if reversal is required on other grounds because if the evidence is insufficient, the court must render a judgment of acquittal, which is greater relief than reversal and remand). We hold that the evidence was legally sufficient to support the jury's verdict.

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021), *cert. denied*, 142 S. Ct. 859 (2022).

"A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to

18

engage in the conduct or cause the result." Tex. Penal Code Ann. § 6.03(a). A factfinder may infer that a person intends the natural consequences of his acts. *Harmel v. State*, 597 S.W.3d 943, 954 (Tex. App.—Austin 2020, no pet.) (citing *Medina v. State*, 7 S.W.3d 633, 637 (Tex. Crim. App. 1999)). Intent may be inferred from any facts tending to prove its existence, including the method of committing the crime; the wounds inflicted on the victim; and the defendant's acts, words, and conduct. *Id.*

The jury heard ample circumstantial evidence probative of intent:

- Alkayyali's and Moussa's marriage was undisputedly strained and she consistently requested a divorce;

- Immediately preceding Moussa's death, Alkayyali told Smith that Moussa treated him like "shit," that their situation was "bad," that Moussa had a "black soul," and that he hated his life;

- Alkayyali testified that, on the morning of Moussa's death, he had been sleeping on the couch and they argued;

- Alkayyali admitted that he pushed Moussa and repeatedly placed his hands on her mouth;

- Alkayyali testified that, during this struggle, Moussa became unconscious;

- With Moussa unconscious, Alkayyali left the apartment and called Smith to say that he had hit Moussa and covered her mouth, that she was unconscious, and that he was going to jail;

- The paramedic noticed bloody sputum and ligature marks on Moussa's throat, which led him to believe that she had been strangled;

- The medical examiner ruled Moussa's death a homicide by asphyxia and testified that this was supported by her various injuries, the bloody sputum, and petechiae under her scalp; and

19

- The medical examiner testified that it would take "minutes" to manually strangle or smother someone to death.

Taken as a whole and viewed in the light most favorable to the verdict, we hold that this constituted sufficient evidence for a rational juror to conclude that Alkayyali acted with the requisite intent to convict him of murder. *See Harmel*, 597 S.W.3d at 954–55 (holding evidence was sufficient to prove intent to murder when the victim's injuries indicated that she had been strangled to unconsciousness and that the defendant left her in that state). We overrule Alkayyali's fourth and fifth points of error.

## IV. CONCLUSION

Having held that Alkayyali was egregiously and reversibly harmed by jury-charge error and overruled his points on evidentiary sufficiency, we need not consider his remaining points of error. *See* Tex. R. App. P. 47.1. We reverse his murder conviction and remand to the trial court for further proceedings. *See Hutch*, 922 S.W.2d at 174 (reversing and remanding upon holding that appellant was egregiously harmed by jury-charge error).

/s/ Brian Walker

Brian Walker
Justice

Publish

Delivered: April 20, 2023

20